(No. 11055.)

WICKS STONE COMPANY, Appellant, *vs.* ELIZABETH G. DICKASON, Admx., Appellee.

*Opinion filed February 21, 1917.*

CORPORATIONS—*when unpaid balance of subscription to capital stock cannot be allowed as a claim against subscriber's estate.* An unpaid balance of a subscription to the capital stock of a corporation cannot be allowed as a claim by the corporation against the subscriber's estate, where the corporation has paid its debts, disposed of its property and ceased to do business because the enterprise was unprofitable, and where it cannot be ascertained what proportion of the unpaid subscription is required to pay said subscriber's share of the losses sustained by the corporation.

APPEAL from the Second Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. JOHN McNUTT, Judge, presiding.

CLAUDE O. NETHERTON, and CARLETON H. PENDLETON, (WALTER BACHRACH, and L. SHIRLEY TARK, of counsel,) for appellant.

ASHCRAFT & ASHCRAFT, (E. M. ASHCRAFT, of counsel,) for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

Appellant, the Wicks Stone Company, a corporation, filed in the probate court a claim for $4062.50 against the estate of L. T. Dickason. The claim was for a balance on the subscription by Dickason, in his lifetime, to the capital stock of appellant. The probate court disallowed the claim and the Wicks Stone Company appealed to the circuit court. The cause was tried in that court before a jury, and at the close of all the evidence the court instructed the jury to return a verdict against claimant and rendered judgment against it for costs. The Wicks Stone Company prosecuted an appeal to the Appellate Court for the First District.

That court affirmed the judgment of the circuit court and granted a certificate of importance, upon which said company has prosecuted this appeal to this court.

In 1906 Dickason, Miers, Wicks and others, stockholders in the Mathers Stone Company, a corporation engaged in quarrying stone in Monroe county, Indiana, decided to organize another corporation to engage in the same business on land joining the Mathers Stone Company's land. Under date of August 25, 1906, the following written agreement was signed by several parties:

"CHICAGO, *August 25, 1906.*

"We, the undersigned, agree to take the amount opposite our names in stock in the new quarry company to be organized and opened upon the land lying south of and adjacent to the Mathers Stone Company, in Monroe county, Indiana, and to pay for same at the rate of fifty per cent of amount subscribed. We further agree to pay twenty per cent of the amount subscribed at time of subscription and remainder by January 1, 1907, as same may be needed and called for by W. W. Wicks."

Opposite the name of each party was the amount of subscription in figures, the amount opposite the name "Dickason" being $10,000. Dickason did not sign the subscription but his name was signed to it by Miers. This appears to have been agreeable to Dickason,—at least after knowledge of it he said it was satisfactory and by his subsequent acts he clearly ratified it. Later, articles of incorporation were drawn up for the Wicks Stone Company, naming Dickason as one of the directors for the first year, and with others he signed the articles. The articles of incorporation were signed in duplicate, one copy being filed with the Secretary of State of Indiana and the other with the recorder of Monroe county. A charter was issued to the corporation and it proceeded to do the work for which it was organized. While the shares of stock were $100 each, the subscription agreement stated that the subscribers were only to pay one-half of that amount for it, twenty per cent of the amount subscribed to be paid at the time of subscription "and re-

mainder by January 1, 1907, as same may be needed and called for by W. W. Wicks." Dickason in his lifetime paid $1750 on his stock in installments, as follows: $500 January 18, 1907; $500 February 18, 1907; $500 April 18, 1907, and $250 August 15, 1907. These installments appear to have been made according to a call issued for payments. Some of the other parties who signed the subscription agreement paid for their stock in full by property turned over to the corporation, some by services rendered in promoting the enterprise, some gave their notes and some paid cash. It appears the stock was not paid up by January 1, 1907, and at a stockholders' meeting March 17, 1909, the following resolution was adopted:

"It was on motion ordered that all stock in the company be issued April 1, 1909, to all stockholders desiring to make final payment; that stockholders not desiring to make cash payments give note to company dated April 1, 1909, for amount unpaid. Note to be due one day after date and bear interest at four per cent from date and to be non-negotiable. Further, that if assessment of over ten per cent on stock be made, thirty days' notice shall be given. Stock to be issued upon payment of notes. Certificate to be held by the company until note is finally paid." * * *

The enterprise did not prove profitable and has been abandoned, and the money collected on stock subscriptions was used in the payment of liabilities incurred. All indebtedness has been paid, the corporation is no longer engaged in business, its lands have been disposed of, and it is admitted if the claim against the Dickason estate is collected the money will be distributed among the stockholders.

Several defenses are interposed against the liability of the Dickason estate, but in view of the conclusion we have reached it will only be necessary to refer to one of them. No rights of creditors are here involved and it is conceded no debts exist. The corporation, though still in existence, has ceased to do business and has disposed of its quarry, and the collection of the claim here involved is sought for the purpose of distributing its proceeds among the stock

subscribers. A large portion of the payments made by the subscribers was made either in property or promotion services. Only a few subscribers made any cash payments, and one paid his subscription in full in cash. If the corporation is authorized to collect this claim it would also be entitled to collect all other unpaid subscriptions. The money is not required for any corporate purpose, for the corporation has ceased doing business and has no indebtedness. Collections from unpaid subscriptions would become assets of the corporation, and as it has ceased to do business could only be distributed among the stockholders according to their equities in the proceeds.

The precise question in an action of this character has not, so far as we are informed, been heretofore decided in this State. In Thompson on Corporations (vol. 1, sec. 792,) the author says: "And the general principle, supported by the authorities, is, that a mere non-user of the corporate franchise will not release a subscriber when the rights and claims of creditors have intervened and it possibly applies as between the corporation and subscribers. But the application of this principle must be reasonable." We are convinced that the application of the principle would be unreasonable in a case where, as here, it is apparent it cannot be ascertained and determined what proportion of the unpaid Dickason subscription is required to pay his share of the losses sustained by the corporation. The remedy, if any, we think, must be found in a different proceeding and in another forum.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*